CULPEPPER IP, LLLC
Kerry S. Culpepper, HI Bar No. 9837
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:     (808) 464-4047
Facsimile:      (202) 204-5181
E-Mail:         kculpepper@culpepperip.com
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| AFTER II MOVIE, LLC; BODYGUARD PRODUCTIONS, INC.; HITMAN 2 PRODUCTIONS, INC.; KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., MILLENNIUM IP, INC.; MILLENNIUM MEDIA, INC.; MON, LLC; MORGAN CREEK PRODUCTIONS, INC.; NIKOLA PRODUCTIONS, INC.; OUTPOST PRODUCTIONS, INC.; RAMBO V PRODUCTIONS, INC.; SF FILMS, LLC; VENICE PI, LLC; VOLTAGE HOLDINGS, LLC; WONDER ONE, LLC; YAR PRODUCTIONS, INC.; GLACIER FILMS I, LLC; DALLAS BUYERS CLUB, LLC; JUSTICE EVERYWHERE PRODUCTIONS, LLC; I AM WRATH PRODUCTION, INC.; HANNIBAL CLASSICS, INC.; and BADHOUSE STUDIOS, LLC, | § § § § § § § § § § § § § § § § § § § § § § § § § § § | **Case No.:** 1:21-cv-709 (Copyright)<br><br>**COMPLAINT; EXHIBITS A-C;**<br><br>**(1) CONTRIBUTORY COPYRIGHT INFRINGEMENT**<br>**(2) JURY TRIAL DEMANDED** |
| Plaintiffs, | § § | |
| vs. | § § § | |
| GRANDE COMMUNICATIONS NETWORKS, LLC | § § § | |
| Defendant. | § § | |

## COMPLAINT

Plaintiffs AFTER II MOVIE, LLC, BODYGUARD PRODUCTIONS, INC., HITMAN 2

PRODUCTIONS, INC., KILLING LINK DISTRIBUTION, LLC, LHF PRODUCTIONS, INC., MILLENNIUM FUNDING, INC., MILLENNIUM IP, INC., MILLENNIUM MEDIA, INC., MON, LLC, MORGAN CREEK PRODUCTIONS, INC., NIKOLA PRODUCTIONS, INC., OUTPOST PRODUCTIONS, INC., RAMBO V PRODUCTIONS, INC., SF FILMS, LLC, VENICE PI, LLC, VOLTAGE HOLDINGS, LLC, WONDER ONE, LLC, YAR PRODUCTIONS, INC., GLACIER FILMS I, LLC; DALLAS BUYERS CLUB, LLC; JUSTICE EVERYWHERE PRODUCTIONS, LLC; I AM WRATH PRODUCTION, INC.; HANNIBAL CLASSICS, INC.; and BADHOUSE STUDIOS, LLC ("Plaintiffs") file this Complaint against Defendant GRANDE COMMUNICATIONS NETWORKS, LLC ("Defendant") and allege as follows:

## I.       NATURE OF THE ACTION

1.       This matter arises under the United States Copyright Act of 1976, as amended, 17 U.S.C. §§ 101, et seq. (the "Copyright Act").

2.       The Plaintiffs allege that Defendant is secondarily liable for copyright infringement in violation of 17 U.S.C. §§ 106 and 501.

## II.       JURISDICTION AND VENUE

3.       This Court has subject matter jurisdiction over this action pursuant to 17 U.S.C. §§ 101, et. seq., (the Copyright Act), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1338 (patents, copyrights, trademarks, and unfair competition).

4.       Defendant either resides in, solicits, transacts, or is doing business within this jurisdiction, and has committed unlawful and tortious acts both within and outside this jurisdiction with the full knowledge that her acts would cause injury in this jurisdiction.  As such, Defendant has sufficient contacts with this judicial district to permit the Court's exercise of personal

2

20-023M

jurisdiction over her.

5.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) - (c) because: (a) all or a substantial part of the events or omissions giving rise to the claims occurred in this District; and, (b) the Defendant resides, and therefore can be found, in this State.  Additionally, venue is proper in this District pursuant to 28 U.S.C. § 1400(a) (venue for copyright cases), because the Defendant or Defendant's agents reside or may be found in this District.

### III.     PARTIES

### A.   The Plaintiffs

6.     The Plaintiffs are owners of the copyrights for the motion pictures ("Works"), respectively, as shown in Exhibit "A".

7.     Plaintiffs are producers of popular motion pictures currently available for sale online and in brick and mortar retail stores. Many of these critically acclaimed motion pictures were released in theaters throughout the world and feature A-list actors such as Samuel Jackson, Ryan Reynolds, Sylvester Stallone, Nicholas Cage, Angela Basset, Gerard Butler, Gary Oldman, Common, Linda Cardellini, Milla Jovovich, Pierce Brosnan, Dylan McDermott, Woody Harrelson, James Marsden and Rob Reiner, among others.

8.     Plaintiffs invested significant financial resources, time and effort in making and marketing these motion pictures based upon the expectation that they would have an opportunity to get a return on their investment from rentals and sales. Massive piracy of these motion pictures on the Internet via peer-to-peer networks by subscribers of Internet Service Providers ("ISPs") such as Defendant and the willful failure of the ISPs to deal with this issue despite clear notice of it have hindered this opportunity.

9.     AFTER II MOVIE, LLC is a Nevada limited liability company with its principal

20-023M

place of business at Las Vegas, NV.

10.    BODYGUARD PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

11.    HITMAN 2 PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

12.    HUNTER KILLER PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

13.    KILLING LINK DISTRIBUTION, LLC is a California limited liability company with its principal place of business at Beverly Hills, CA.

14.    LHF PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

15.    MILLENNIUM FUNDING, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

16.    MILLENNIUM IP, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

17.    MILLENNIUM MEDIA, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada.

18.    MON, LLC is a California limited liability company with its principal place of business at Beverly Hills, CA.

19.    NIKOLA PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

20.    OUTPOST PRODUCTIONS, INC. is a corporation organized under the laws of

20-023M

the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

21.    RAMBO V PRODUCTIONS, INC. is a corporation organized under the laws of the State of Nevada, has a principal office in Nevada and is an affiliate of Millennium Media.

22.    SF FILMS, LLC is a New York limited liability company with its principal place of business in New York, New York and is an affiliate of Voltage Pictures.

23.    VENICE PI, LLC is a California limited liability company with its principal place of business at Los Angeles, CA.

24.    VOLTAGE HOLDINGS, LLC is a limited liability company registered under the laws of the State of Nevada, has principal offices in Los Angeles, California and is an affiliate of Voltage Pictures.

25.    WONDER ONE, LLC is a Wyoming limited liability company with its principal place of business at Sherman Oaks, CA.

26.    YAR PRODUCTIONS, INC. is a corporation organized under the laws of the State of New York, has a principal place of business in New York and is an affiliate of Voltage Pictures.

27.    GLACIER FILMS I, LLC is a Louisiana limited liability company with its principal place of business in Studio City, California.

28.    DALLAS BUYERS CLUB, LLC is a Texas limited liability company with its principal place of business at The Woodlands, TX.

29.    JUSTICE EVERYWHERE PRODUCTIONS, LLC is a Georgia limited liability company with its principal place of business at Los Angeles, CA.

30.    I AM WRATH PRODUCTION, INC. is a California corporation with its principal place of business at 1901 Ave of the Stars Suite 1050, Los Angeles, CA.

31.    HANNIBAL CLASSICS, INC. is a California corporation with its principal place

20-023M

of business at 8033 Sunset Blvd Suite 1066 West Hollywood, CA.

32.     BADHOUSE STUDIOS, LLC is a Wyoming limited liability company with its principal place of business at West Hollywood, CA.

### B.  The Defendant

33.     Defendant is a limited liability company organized and existing under the laws of the State of Delaware, with its headquarters at 401 Carlson Circle, San Marcos, TX 78666.

34.     Defendant is a member of The American Registry of Internet Numbers ("ARIN"), which is a nonprofit, member-based organization that manages and distributes Internet number resources such as Internet Protocol ("IP") addresses and Autonomous System Numbers.

35.     Defendant has an ARIN "Org" kind handle of C06137591 with full name "Grande Communications" and an address of 401 Carlson Circle, San Marcos, TX 78666.

36.     Defendant is a Texas ISP that provides transmitting, routing, or connection for material through a system or network controlled or operated by or for Defendant ("Internet service") to subscribers in Austin, Dallas, San Antonio, and other locations throughout the state of Texas

37.     Many of Defendant's subscribers are motivated to subscribe to Grande's service because it allows them to download movies and other copyrighted content—including unauthorized content—as efficiently as possible.

38.     Accordingly, Defendant promotes its service to download and upload large amounts of content for subscribers for "downloading music, streaming movies and gaming". *See* Decl. of Joshua Lee at ¶6.

39.     In exchange for this service, Defendant charges its subscribers monthly fees ranging in price based on the speed of service.

20-023M

40.     At all relevant times, Defendant knew that its subscribers routinely used its network for illegally downloading and uploading copyrighted works, particularly Plaintiffs' Works. As described below, Plaintiffs' agent sent over 5,500 notices styled per 17 U.S.C. §512(c)(3) to Defendant's designated abuse contact informing Defendant that many of its subscribers were actively utilizing their service to infringe Plaintiffs' Works. Those notices gave Defendant the specific identities of its infringing subscribers, referred to by their Internet Protocol ("IP") addresses, port numbers and time of infringement (to the second). Nonetheless, Defendant persistently turned a blind eye to the massive infringement of Plaintiffs' Works occurring over its network.  Defendant allowed the illegal activity because it was popular with subscribers and acted as a draw to attract and retain new and existing subscribers. Defendant's subscribers, in turn, purchased more bandwidth and continued using Defendant's services to infringe Plaintiffs' Works.

41.     Defendant knew that if it terminated or otherwise prevented repeat infringer subscribers from using it service to infringe, or made it less attractive for such use, Defendant would enroll fewer new subscribers, lose existing subscribers, and ultimately lose revenue. For those account holders and subscribers who wanted to download files illegally at faster speeds, Defendant obliged them in exchange for higher rates. In other words, the greater the bandwidth its subscribers required for pirating content, the more money Defendant made.

### IV.     JOINDER

42.     Pursuant to Fed. R. Civ. P. 20(a)(1), each of the Plaintiffs was properly joined because, as set forth in more detail below, the Plaintiffs assert that the infringements complained of herein by Defendant were part of a series of transactions and occurrences involving Defendant's subscribers, namely Defendant's subscribers widespread use of piracy applications

20-023M

to pirate Plaintiffs' Work and Defendant's failure to take any measures to stop its subscribers' infringing activities.

## V. FACTUAL BACKGROUND

### A. The Plaintiffs Own the Copyright to the Work

43. As shown in Exhibit "A", the Plaintiffs are the registered owners of the copyrights for the Works.

44. Each of the Works contains original material that is copyrightable subject matter under the laws of the United States.

45. The Works are currently offered for sale in commerce.

46. Defendant also had notice of Plaintiffs' rights through notices that were sent to Defendant's abuse contact.

### B. Defendant's subscribers Infringe Plaintiffs' Copyrights.

47. Defendant's subscribers use BitTorrent to infringe Plaintiffs' exclusive rights of reproduction and distribution.

48. BitTorrent is one of the most common peer-to-peer file sharing protocols (in other words, set of computer rules) used for distributing large amounts of data.

49. The BitTorrent protocol's popularity stems from its ability to distribute a large file without creating a heavy load on the source computer and network. In short, to reduce the load on the source computer, rather than downloading a file from a single source computer (one computer directly connected to another), the BitTorrent protocol allows users to join a "swarm" of host computers to download and upload from each other simultaneously (one computer connected to numerous computers).

20-023M

50.     In a report from January 2011, a survey conducted by the firm Envisional estimated that 11.4 percent of all Internet traffic involved the unauthorized distribution of non-pornographic copyrighted content via BitTorrent. *See* Envisional, "Technical report: An Estimate of Infringing Use of the Internet", January 2011, https://www.ics.uci.edu/~sjordan/courses/ics11/case_studies/Envisional-Internet_Usage-Jan2011-4.pdf [last accessed July 21, 2021].

51.     A more recent study by Sandvine determined that file-sharing accounts for 3 percent of global downstream and 22 percent of upstream traffic, with 97% of that traffic in turn being BitTorrent. *See* Sandvine, "The Global Internet Phenomena Report", October 2018, https://www.sandvine.com/hubfs/downloads/phenomena/2018-phenomena-report.pdf [last accessed on May 27, 2021].

**1) The Initial Seed, Torrent, Hash and Tracker**

52.     A BitTorrent user that wants to upload the new file, known as an "initial seeder," starts by creating a "torrent" descriptor file using, for example, the Client he or she installed onto his or her computer.

53.     The initial user or seeder of a file used a process referred to as "ripping" to create a copy of motion pictures from either Blu-ray or legal streaming services.

54.     The initial seeder often modifies the file title of the Work to include a wording such as "FGT", "RARBG" or "YTS" in the title of the torrent files and file copies in order to enhance a reputation for the quality of his or her torrent files and attract users to his or her piracy website.

55.     The Client takes the target computer file, the "initial seed," here the copyrighted Work, and divides it into identically sized groups of bits known as "pieces."

56.     The Client then gives each one of the computer file's pieces, in this case, pieces of the copyrighted Works, a random and unique alphanumeric identifier known as a "hash" and records these hash identifiers in the torrent file.

57.     When another peer later receives a particular piece, the hash identifier for that piece is compared to the hash identifier recorded in the torrent file for that piece to test that the piece is error-free. In this way, the hash identifier works like an electronic fingerprint to identify the source and origin of the piece and that the piece is authentic and uncorrupted.

58.     Torrent files also have an "announce" section, which specifies the URL (Uniform Resource Locator) of a "tracker," and an "info" section, containing (suggested) names for the files, their lengths, the piece length used, and the hash identifier for each piece, all of which are used by Clients on peer computers to verify the integrity of the data they receive.

59.     The "tracker" is a computer or set of computers that a torrent file specifies and to which the torrent file provides peers with the URL address(es).

60.     The tracker computer or computers direct a peer user's computer to other peer user's computers that have particular pieces of the file, here the copyrighted Work, on them and facilitates the exchange of data among the computers.

61.     Depending on the BitTorrent Client, a tracker can either be a dedicated computer (centralized tracking) or each peer can act as a tracker (decentralized tracking.)

**2) Torrent Sites**

62.     "Torrent sites" are websites that index torrent files that are currently being made available for copying and distribution by people using the BitTorrent protocol.  There are numerous torrent websites including the notorious YTS, The Pirate Bay and RARBG websites. These websites were noted by the Office of the United States Trade Representative ("USTR") as

examples of Notorious Markets defined as an online marketplace reportedly engaged in and facilitating substantial piracy. *See* USTR, 2014 Out-of-Cycle Review of Notorious Markets, Mar. 5, 2015, pg. 17, Available at https://ustr.gov/sites/default/files/2014%20Notorious %20Markets%20List%20-%20Published_0.pdf [last accessed on May 7, 2021]; *see also* USTR, 2018 Out-of-Cycle Review of Notorious Markets, April 2019, pgs. 24, 27-28, Available at https://ustr.gov/sites/default/files/2018_Notorious_Markets_List.pdf [accessed on May 7, 2021].

### 3) Defendant's subscribers access torrent sites from IP addresses provided by Defendant

63.     Defendant's subscribers accessed torrent sites including the YTS website to upload and download Plaintiffs' copyrighted Work from IP addresses provided by Defendant.

64.     For example, an individual Grande subscriber using email address dizzle****@hotmail.com accessed the torrent website YTS from IP address 66.196.3.46 assigned by Defendant and downloaded a torrent file for pirating the Work *Angel Has Fallen* on Nov. 26, 2019.  *See* Exhibit "B" at pg. 2.

### 4) Uploading and Downloading a Work Through a BitTorrent Swarm

65.     Once the initial seeder has created a torrent and uploaded it onto one or more torrent sites, then other peers begin to download and upload the computer file to which the torrent is linked (here the copyrighted Works) using the BitTorrent protocol and BitTorrent Client that the peers installed on their computers.

66.     The BitTorrent protocol causes the initial seeder's computer to send different pieces of the computer file, here the copyrighted Work, to the peers seeking to download the computer file.  Defendants transmit the pieces to the peers.

67.     Once a peer receives a piece of the computer file, here a piece of the copyrighted Work, it starts transmitting that piece to the other peers.  Defendants transmit the pieces to the peers.

68.     In this way, all of the peers and seeders are working together in what is called a "swarm."

69.     Here, the Defendant's subscribers participated in a swarm and directly interacted and communicated with other members of the swarm through digital handshakes, the passing along of computer instructions, uploading and downloading, and by other types of transmissions, Plaintiffs' Works.

70.     Defendant distributed the subscribers' transmissions to other members of the swarm.

71.     In this way, and by way of example only, one initial seeder can create a torrent that breaks a movie up into hundreds or thousands of pieces saved in the form of a computer file, like the Works here, upload the torrent onto a torrent site, and deliver a different piece of the copyrighted Work to each of the peers. The recipient peers then automatically begin delivering the piece they just received to the other peers in the same swarm.

72.     Once a peer has downloaded the full file, the BitTorrent Client reassembles the pieces and the peer is able to view the movie. Also, once a peer has downloaded the full file, that peer becomes known as "an additional seed," because it continues to distribute the torrent file, here the copyrighted Work.

73.     For example, the individual who used email address dizzle****@hotmail.com shared copies of the Work *Angel Has Fallen* under the file name "Angel Has Fallen (2019) [BluRay] [720p] [YTS.LT]" multiple times on Nov. 26, 2021 from IP address 66.196.3.46.

**5) The Plaintiffs' Computer Investigator Identified Defendant's IP Addresses as Participants in Swarms That Were Distributing Plaintiffs' Copyrighted Works.**

74.     The Plaintiffs engaged Maverickeye UG ("MEU") to identify the IP addresses that are being used by those people that are using the BitTorrent protocol and the Internet to reproduce, distribute, display or perform the Plaintiff's copyrighted Work.

75.     MEU used forensic software to enable the scanning of peer-to-peer networks for the presence of infringing transactions.

76.     MEU extracted the resulting data emanating from the investigation, reviewed the evidence logs, and isolated the transactions and the IP addresses associated therewith for the files identified by the SHA-1 hash value of the Unique Hash Number.

77.     MEU logged information including the IP addresses, Unique Hash Numbers, and hit dates that show that Defendant's subscribers distributed pieces of the Plaintiffs' copyrighted Works identified by the Unique Hash Number.

78.     Defendant's subscribers' computers used the identified IP addresses to connect to the investigative server in order to transmit a full copy, or a portion thereof, of a digital media file identified by the Unique Hash Number.

79.     MEU's agent analyzed each BitTorrent "piece" distributed by the IP addresses and verified that re-assemblage of the pieces using a BitTorrent Client results in a fully playable digital motion picture of the Works.

80.     MEU's agent viewed the Works side-by-side with the digital media file that correlates to the Unique Hash Number and determined that they were identical, strikingly similar or substantially similar.

81.     For example, MEU logged records showing that the Work *Angel Has Fallen* was shared under the file name "Angel Has Fallen (2019) [BluRay] [720p] [YTS.LT]" multiple times on Nov. 26, 2021 from IP address 66.196.3.46.

**C. The Operator of the YTS website confirmed that at least one of Defendants' subscribers' accounts was used to download torrent files for copying copyright protected Works from the YTS website.**

82.     The YTS website operator maintained records of activity of registered user accounts.  *See* Exhibit "B" at pg. 3 (Certificate of Authenticity).

83.     As shown in Exhibit "B", the records including the email address of the registered user account, the torrent files the registered account downloaded, the IP address from where the registered user accessed the YTS website, and the time.

**D. Defendant's subscribers distributed copies of Plaintiffs' Works.**

84.     Defendant's subscribers distributed at least pieces of each of Plaintiffs' Works over network connections provided by Defendants to other peers in the Swarm.

85.     Defendant's subscriber at IP address 66.196.3.46 distributed multiple copies of the Works *After*, *Hellboy* and *Angel Has Fallen*.

86.     Defendant's subscriber at IP address 24.155.189.11 distributed <u>thousands</u> of copies of the Work *Rambo V: Last Blood*.

**E) Defendant had knowledge that its subscribers were infringing Plaintiffs' Works and distributing file copies of the Works but continued to provide service to their subscribers.**

20-023M

87.     Plaintiffs engaged MEU to generate Notices of infringements ("Notices") styled per 17 U.S.C. §512(c)(3) of the Digital Millennium Copyright Act ("DMCA") to be sent to service providers of IP addresses where MEU confirmed infringement of copyright protected content.

88.     Each Notice included at least the name of the copyright owner, the title of the Work, the manner by which it was infringed, the infringing file name which includes the altered Copyright Management Information, the IP address and port number at where infringement was confirmed and the time of infringement down to the second.  *See* Exhibit "C" (Attached Exhibit 1) (excerpt below).

> Protocol: BITTORRENT
> Infringed Work: Angel Has Fallen
> Infringing FileName: Angel Has Fallen (2019) [WEBRip] [720p] [YTS.LT]
> Infringing FileSize: 1139772927
> Infringer's IP Address: 24.155.189.11
> Infringer's Port: 54689
> Initial Infringement Timestamp: 2020-01-28 23:32:10

89.     MEU determines the proper service provider assigned the IP addresses at issue from publicly available information from ARIN.

90.     MEU determines the proper abuse contact email address for the service provider assigned the IP addresses from the ARIN records, DMCA designated directory and Defendants' website.

91.     Plaintiffs' agent sends the Notice to the abuse contact email address.

92.     Defendant is required to update the WHOIS records for the IP addresses it reassigns or reallocates per its registration agreement with ARIN.

93.     Plaintiffs' agent has sent over 5,800 Notices to Defendant concerning infringements of copyright protected Works including Plaintiffs' at IP addresses assigned to Defendants from ARIN.

20-023M

94.     For example, Plaintiffs' agent sent over 1000 Notices to Defendant concerning infringement of the motion picture *The Hitman's Bodyguard* at IP addresses assigned to Defendant from ARIN.

95.     For example, Plaintiffs' agent sent over 500 Notices to Defendant concerning infringement of the motion pictures *I Feel Pretty* and *Hellboy* at IP addresses assigned to Defendant from ARIN.

96.     For example, Plaintiffs' agent sent over 450 Notices to Defendant concerning infringement of the motion picture *Angel Has Fallen* at IP addresses assigned to Defendants from ARIN.

97.     For example, Plaintiffs' agent sent over 350 Notices to Defendant concerning infringement of the motion picture *Rambo V: Last Blood* at IP addresses assigned to Defendants from ARIN.

98.     For example, Plaintiffs' agent sent over 300 Notices to Defendants concerning infringement of the motion picture *Ava* at IP addresses assigned to Defendants from ARIN.

99.     Plaintiffs' agent sent over 75 Notices to Defendant concerning observed infringements at each of IP addresses 24.155.189.11 and 24.155.79.34.

100.     Upon information and belief, other rightsholders had similar Notices sent to Defendant concerning infringing activity at IP addresses assigned to Defendant from ARIN.

101.     Defendant failed to terminate the subscribers of the accounts associated with these IP addresses or take any meaningful action in response to these Notices.

102.     Defendant often failed to even forward the Notices to their subscribers.

20-023M

103.    Defendant continued to provide service to the subscribers despite knowledge that its subscribers were using the service to engage and facilitate massive piracy of copyright protected Works including the Copyright Plaintiffs'.

104.    Plaintiffs' counsel sent a letter to Defendant detailing these concerns and pointing to detailed examples of prolific piracy behavior by subscribers on Oct. 15, 2020. *See* Exhibit "C".

105.    Defendant completely ignored the letter and continued to provide service to even the subscribers engaged in prolific piracy detailed in the letter.

106.    Defendant's failure to terminate or take any meaningful action against its subscribers resulted in a cascade of piracy of Plaintiffs' Works.

### F) Defendant controls the conduct of its subscribers.

107.    Defendant can terminate the accounts of their subscribers at any time.

108.    Upon information and belief, Defendant promptly terminates subscriber accounts for committing any prohibited or abusive activities or failing to pay for the Service. *See* Decl. of Joshua Lee at ¶5.

109.    Indeed, Defendant explicitly states that they have the right to disconnect or temporarily suspend a subscriber's account, including for DMCA violations. Yet, Defendant has failed to actually act on these purported policies. *See Id.*

### G) Defendant does not have a safe harbor from liability.

110.    As part of the DMCA, Congress created a safe harbor that limits the liability of a service provider for copyright infringement when their involvement is limited to, among other things, "transmitting, routing, or providing connections for, material through a system or network controlled or operated by or for the service provider." 17 U.S.C. § 512(a). To benefit from this

20-023M

safe harbor, however, an ISP must demonstrate that it "has adopted and reasonably implemented...a policy that provides for the termination in appropriate circumstances of subscribers...who are repeat infringers." 17 U.S.C. § 512(i)(1)(A).

111.    Defendant does not have a policy of terminating repeat infringers.

112.    Plaintiffs' agent has sent over 5,800 Notices to Defendants concerning infringements at IP addresses Defendants publish as assigned to them.

113.    Defendant failed to terminate the accounts and/or take any meaningful actions against their subscribers in response to the Notices consistent with a reasonably implemented policy for termination of subscribers and account holders of the service provider's system or network who are repeat infringers necessary to support a safe harbor from liability ("policy").

114.    Below are examples of Defendant's failure to reasonably implement the requisite Policy.

115.    Defendant failed to terminate the account and/or take any meaningful action against their subscribers at IP addresses 24.155.189.11 and 24.155.79.34 even after Plaintiffs' agent sent over 75 Notices for each of these IP addresses to Defendant and Plaintiffs' counsel sent a letter.

## H) The copyright infringements arise from Defendant's advertisements.

116.    At all relevant times, Defendant's subscribers have paid substantial subscription fees for access to Defendants' high-speed Internet network.

117.    Defendant offers a tiered pricing structure so its subscribers can have even higher downloading and uploading speed for a higher monthly fee. *See* Decl. of Joshua Lee at ¶3.

118.    Defendant advertises the highest tier for $64.99 for 940 Mbps. Id. at ¶4.

119.    As recently as Aug. 9, 2021, Defendant advertised the ability to use this tier of service to "...download movies". *See* Id.

18

20-023M

120.    Defendant's subscribers are motivated to become subscribers from Defendants' advertisements.

121.    Defendant's subscribers are motivated to become subscribers from the knowledge of Defendants' practice of ignoring notices of infringements or failing to take any meaningful action.

## VII. CLAIM FOR RELIEF
### (Contributory Copyright Infringement)

122.    Plaintiffs re-allege and incorporate by reference the allegations contained in each of the foregoing paragraphs.

123.    Through its activities, Defendant knowingly and intentionally took steps that are substantially certain to result in direct infringement of Copyright Plaintiffs' Copyrighted Works, and that have resulted in such direct infringement in violation of Plaintiffs' copyrights.

124.    Despite Defendant's knowledge that its subscribers were using its service to engage in widescale copyright infringements, Defendant has failed to take reasonable steps to minimize the infringing capabilities of its service.

125.    Defendants' actions of providing transmission, routing, or connections for said copies of the Works to its subscribers is a direct and proximate cause of the infringements of Plaintiffs' Works.

126.    Defendant is liable as a contributory copyright infringer for the infringing acts of its subscribers.  Defendant has actual and constructive knowledge of the infringing activity of its subscribers.  Defendant knowingly caused and otherwise materially contributed to these unauthorized distributions and reproductions of Plaintiffs' Works.

127.    Defendant's contributory infringements were committed "willfully" within the meaning of 17 U.S.C. § 504(c)(2).

20-023M

128.     By engaging in the contributory infringement alleged in this Complaint, Defendant deprived not only the producers of the Works from income that could have been derived when the respective film was shown in public theaters and offered for sale or rental, but also all persons involved in the production and marketing of this film, numerous owners of local theaters and retail outlets and their employees, and, ultimately, the local economy.   Defendant's misconduct therefore offends public policy.

129.     Plaintiffs are entitled to elect to recover from Defendant statutory damages for her violations of 17 U.S.C. § 1202.

130.      Plaintiffs are further entitled to costs and reasonable attorneys' fees.

131.     As a direct and proximate result of the infringement to which Defendant knowingly and materially contributes and contributed, Plaintiffs are entitled to injunctive or other equitable relief as provided by, for example, 17 U.S.C. §§ 512(j)(1)(A) and (B) including but not limited to an order restraining the Defendant from providing access to infringing material or activity residing at movie piracy websites including but not limited to: (a) YTS; (b) Piratebay; (c) Rarbg; and (d) 1337x; and/or taking reasonable steps to block access to said movie piracy websites.

## VIII. PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully requests that this Court:

(A) permanently enjoin Defendant from continuing to contribute to infringements of the Plaintiffs' copyrighted Works;

(B) order Defendant to adopt a policy that provides for the prompt suspension of service for subscribers for which Defendants receive more than three unique notices of infringements of copyright protected Works within 72 hours;

(C) order Defendant to block subscribers from accessing notorious piracy websites of

20-023M

foreign origin that are listed in the annual trade report of Notorious Foreign Markets published by the United States Government on all networks under their control to prevent further pirating of Plaintiffs' Works via the BitTorrent protocol;

(D) order the Defendant to disclose to Plaintiffs the identifications of the subscribers who used and use Defendant's service to infringe Plaintiffs' Works on an ongoing basis after said subscribers are provided notice as required by 47 U.S.C. § 551;

(E) award the Plaintiffs their actual damages from the copyright infringements and Defendant's profits in such amount as may be found; alternatively, at Plaintiffs' election, for statutory damages pursuant to 17 U.S.C. § 504(a) and (c) against Defendant;

(F) award the Plaintiffs their reasonable attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

(G) grant the Plaintiffs any and all other and further relief that this Court deems just and proper.

## IX. JURY DEMAND

The Plaintiffs hereby demand a trial by jury on all issues properly triable by jury.

DATED: Kailua-Kona, Hawaii, August 13, 2021.

Respectfully submitted,

/s/ Kerry S. Culpepper
Kerry S. Culpepper

Attorney for Plaintiffs

21

20-023M