CULPEPPER IP, LLLC
Kerry S. Culpepper, HI Bar No. 9837
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawai'i 96740
Telephone:    (808) 464-4047
Facsimile:    (202) 204-5181
E-Mail:       kculpepper@culpepperip.com
Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| AFTER II MOVIE, LLC; ET AL,<br><br>Plaintiffs,<br>vs.<br><br>GRANDE COMMUNICATIONS NETWORKS, LLC<br><br>Defendant. | Case No.: 1:21-cv-709-RP<br>(Copyright)<br><br>**PLAINTIFFS' MOTION TO COMPEL DEFENDANT TO PROVIDE DOCUMENTS AND INFORMATION, RESPONSES TO INTERROGATORIES, AND ANSWER DEPOSITIONS TOPICS; EXHIBITS 1-23; DECLARATION OF KERRY S. CULPEPPER; PROPOSED ORDER** |

1

**PLAINTIFFS' MOTION TO COMPEL DEFENDANT TO PROVIDE DOCUMENTS AND INFORMATION, RESPONSE TO INTERROGATORIES AND TO ANSWER DEPOSITION TOPICS**

Plaintiffs move this honorable Court pursuant to Fed. R. Civ. P. 37(a) for an Order compelling Defendant to provide documents and information, to fully respond to interrogatories and to answer certain deposition topics.

**I.     Introduction**

1. Attached **Exhibit "18"** shows how each of the below main disputes relates to outstanding discovery:

2. No timely production of documents.  Can Defendant completely fail to timely produce documents in response to discovery?

3. The pre-2018 evidence.  Is evidence of Defendant's policies, practices, and procedures such as implementation of its purported DMCA safe harbor policy and termination of customers for nonpayment from 1/1/2010-8/13/2021 relevant in view of the evidence Plaintiffs presented to Defendant of piracy of their Works beginning in early 2015 and Defendant's admission that its policy from 2010-2017 was not terminating repeat infringers?

4. The IP address lease logs.  Are the time durations Defendant assigned Internet Protocol ("IP") addresses to its customers who pirated Plaintiffs' Works relevant evidence for establishing that these same customers are responsible for piracy at the same IP address?

5. Defendant's disparate enforcement practices between other policies its DMCA policy.  During the same period of its purported DMCA policy, are Defendant's policies, practices, and procedures for: (i) terminating customers for non-payment; (ii) enforcing its own IP rights; and (iii) selectively taking measures for piracy of content of studios with which it had a profitable on-demand relationship relevant?

6.      <u>Defendant's discussions of other ISP copyright lawsuits.</u>   Are Defendant's internal communications concerning other ISP copyright lawsuits relevant evidence for proving Defendant's knowledge of its obligations under the law, willful behavior and blindness?

7.      <u>Defendant's profits from pirating customers.</u> Are the gross revenue and profits Defendant obtain from customers and lifetime customer values of the customers that pirated Plaintiffs' Works relevant for proving Defendant's profits from infringements?

8.      <u>Defendant's network monitoring practices</u>. Are Defendant's policies, practices, and procedures for monitoring its network and protecting it from attacks relevant to rebut its denials in the Amended Answer [Doc. #108] of allegations 122-127 that it monitors its subscribers' access, bandwidth, usage, transmissions and content and its contention that it had no way to verify allegations in Notices?

9.      <u>Defendant's relationship with Astound.</u>   Is information about the individuals within Astound that control Defendant's policies and practices relevant?

10.     <u>Piracy notices sent concerning other Works to same subscribers that pirated Plaintiffs' Works.</u>   Is evidence of how Defendant processes notices from other rightsholders relevant for proving that Defendant's DMCA policy is a sham?

## II.     Legal Standard

11.     Fed. R. Civ. P. 26(b)(1) provides that discovery may be taken regarding *inter alia* any nonprivileged matter that is relevant and proportional to the needs of the case.  "Relevant information 'encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case.'" *LULAC v. Abbott*, 2022 WL 3593055, 2022 U.S. Dist. LEXIS 150422, at *6 (W.D. Tex. Aug. 22, 2022).

## III.    Argument

**A.     *This Court's previous Order [Doc. #87] is not applicable to the outstanding discovery.***

12.     Defendant takes the misguided position that this Court's previous Order [Doc. #87] resolves most of these issues including that of the relevancy of pre-8/13/2018 evidence.  *See* Ex. "14" ("…we believe these objections are consistent with the court's motion to compel order…"). Plaintiffs disagree. The previous Order denied Plaintiffs' RFPs 3-5 pertaining to documents in Defendant's possession from *UMG Recordings, Inc. v. Grande Communs. Networks* ("*Grande I*") which the Court characterized as "just basically adopt[ing] the universe of documents from the UMG case".  Ex. "19" (partial transcript) at p. 2.  RFPs 3-5 are not an issue here.   The discovery here is consistent with the Court's guidance for "targeted discovery request either identifying a timeline that has some basis in the facts alleged in this case or particular subscribers."  Id. at p. 3.

**B.     *Evidence concerning Defendant's policies and practices pre-8/13/2018 is relevant*.**

13.     Plaintiffs have presented evidence to Defendant of piracy of their Works going back to 2015.  *See* AFTER260624-260685.  Defendant has conceded in other papers in this case that it had a different policy of no termination from its present policy in 2010 through 2017.  *See* Doc. #72 at p. 3 ("Grande began enforcing such a policy in 2017…"); Ex. "20" (Grande's timeline of events).  Because the policy in place between 2015-2017 began in 2010, Plaintiffs seek discovery from Defendant starting from Jan. 1, 2010 when that policy began.  In *Grande I*, this Court found information on how Defendant handled DMCA notices *prior* to the applicable three-year period relevant. *See Grande I*, 2018 WL 4627276, 2018 U.S. Dist. LEXIS 164761, at *9 (W.D. Tex. Sep. 26, 2018).  Indeed, in *Grande I* this Court determined that Defendant had not implemented a DMCA policy sufficient for a safe harbor. *See Grande I*, 384 F. Supp. 3d 743 (W.D. Tex. 2019). As noted by the Southern District of Fla. in *Disney Enters. v. Hotfile Corp*, because it is questionable whether a party can ever regain the protections of the DMCA, it is necessary to

4

determine the "exact point" when the Defendant implemented a DMCA-compliant policy or stopped being a "hotbed for infringement". *Disney Enters. v. Hotfile Corp.*, No. 11-20427-CIV-WILLIAMS, 2013 WL 6336286, 2013 U.S. Dist. LEXIS 172339, at *80 (S.D. Fla. Aug. 28, 2013). The pre-8/13/2018 discovery Plaintiffs seek will provide evidence of Defendant's knowledge of its obligations under the statute, circumstantial evidence that Defendant was aware of infringing conduct on its system, and that it had the practical ability to take action but chose to continue being a "hotbed for infringement".

14. Defendant argues that discovery prior to 8/13/2018 (three years prior to the filing date) is not relevant based upon the 3-year statute of limitations provided in 17 U.S.C. §507(b). *See, e.g.,* Obj. to RFP #8. However, the Fifth Circuit has reaffirmed the viability of the discovery rule. *See Martinelli v. Hearst Newspapers, LLC*, 65 F.4th 231, 233 (5th Cir. 2023). The discovery rule permits Plaintiffs to make claims based upon the 2015 infringements because Plaintiffs did not acquire knowledge of Defendant's liability until the Fall of 2020. Indeed, there is a public record supporting this fact. On April 4, 2019, some of the Plaintiffs filed lawsuits against the operator of the piracy website YTS, among other defendants, in the District of Hawaii (lead Case No. 1:19-cv-00169-LEK-KJM). On April 14, 2020, the Hawaii District Court entered a stipulated judgment against the YTS website operator. *See* Ex. "21". As alleged in the SAC, in 2020 the YTS website operator provided account information on its registered users included the email address used to register for an account with the YTS website, the torrent files the registered users downloaded, and the IP addresses from where they downloaded the torrent files. *See* Ex. "B" to SAC [Doc. #45 at pp. 39-42] (YTS users). Next, Plaintiffs' counsel obtained data from the agent of some of the Plaintiffs (PML) and the data provider MEU concerning notices sent to Defendant and records of infringement of their Works. *See* SAC at ¶¶72-75. Shortly thereafter, on Oct. 15,

2020, Plaintiffs' counsel sent a demand letter to Defendant to attempt to resolve the issue amicably. *See* Ex. "C" to SAC [Doc. #45 at pp. 43-47]. Accordingly, Plaintiffs did not and could not know of Defendant's secondary liability for copyright infringement and DMCA violations until 2020 when this evidence was obtained from the YTS website operator and MEU. It should be noted that PML (not MEU) is the agent for some of the Plaintiffs. To the extent Defendant demands Plaintiffs provide further evidence in support of the discovery, Plaintiffs are prepared to do so at trial as this Court ruled in *Grande I*. *See Grande I*, April 8, 2020 Order, Doc. #347, pp. 8-9 (attached as Ex. "23").

C.      **The IP address lease logs of Defendant's subscribers is relevant**.

15.     Plaintiffs assert that Defendant was sent thousands of notices concerning ongoing infringement at specific IP addresses yet failed to take simple steps to stop further piracy. *See* SAC at ¶36. For the most part, ISPs such as Defendant assign IP addresses dynamically to their subscribers for a limited time ("lease") and store these assignment records ("log"). The lease logs will establish Defendant's knowledge of its subscribers' piracy and that it failed to reasonably implement a DMCA policy. If Defendant fails to even keep lease logs, this is evidence that Defendant's purported policy is *de facto* unreasonable for failure to track infringers. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1110 (9th Cir. 2007). For example, Defendant's subscriber at IP address 24.155.189.11 shared pirated copies of *Rambo V: Last Blood* and *Angel Has Fallen* continuously from 11/20/2019 to 2/6/2020 despite Plaintiffs' agent sending over 80 notices to Defendant. *See* SAC at ¶84. The lease log will confirm whether Defendant assigned this IP address to the same subscriber for a period inclusive of 11/20/2019-2/6/2020 and thus establish that Defendant had knowledge of the ongoing piracy yet failed to take measures consistent with a DMCA policy. Even Defendant conceded the relevance of the lease logs in its Opposition [Doc.

#92] to Plaintiffs' Motion to Overrule Subscriber objections where it argued that Plaintiffs did not need the subscriber names to determine the IP address lease logs because Defendant could provide this information. *See* Doc. #92 at p. 7 ("To the extent Plaintiffs need to understand whether specific Grande IP addresses were assigned to the same subscriber over time…Plaintiffs can obtain that information directly from Grande.")  Defendant also contends that lease logs for piracy that occurred prior to 8/13/2018 is not relevant.  In addition to this evidence being relevant due to the discovery rule as discussed above, it is also relevant for lease logs that extend through 8/13/2018 because even if a notice was sent prior to 8/13/2018.

***D. Defendant's disparate practices when enforcing policies to its benefit in comparison to its purported DMCA policy is relevant***.

16.   A major issue in this case is whether Defendant has reasonably *implemented* a DMCA policy for terminating repeat infringers consistent with 17 U.S.C. §512(i)(A) sufficient for limiting monetary damages.  Defendant asserts that it has been terminating subscribers per a DMCA policy since 2017. *See* Ex. "19".  However, evidence that Defendant immediately terminates subscribers for non-payment while putting off terminating subscribers that repeatedly infringe Plaintiffs' Works is circumstantial evidence that it has not reasonably implemented a DMCA policy.  Moreover, this evidence is relevant to confirm whether some subscribers Defendant asserts it terminated per its DMCA policy were in fact terminated for non-payment. Plaintiffs note that this Court concluded in *Grande I* that this type of evidence was admissible at trial. *See Grande I*, April 8, 2020 Order, Doc. #347, p. 16 (Ex. "23").  Further, this evidence will be necessary to rebut an argument that Defendant appears ready to make about the COVID pandemic and a First Amendment right to Internet service.  Defendant cannot have it both ways

by arguing that it did not want to terminate subscribers out of concern of COVID-19 or the First Amendment when it was promptly terminating subscribers for non-payment.

17.     Similarly, evidence of contradictory practices such as that Defendant takes aggressive action when businesses pirate live sports for which it has exclusive rights or when its subscribers infringe Works of film studios or distributors for which Defendant has negotiated specific agreements to profit is relevant circumstantial evidence showing that its DMCA policy is a sham.  *See Sony Music Entm't v. Cox Communs.*, Inc., No. 1:18-cv-950-LO-JFA, 2019 WL 13298945, 2019 U.S. Dist. LEXIS 231858, at *4 (E.D. Va. Nov. 19, 2019) (Finding communications not directed at specific infringement of works are directly relevant circumstantial evidence regarding the ISP's policies).  Because the issue of Defendant's intent will likely not be susceptible to direct proof, it will be appropriate for the factfinder to consider the conflicting inferences that the circumstantial evidence may present. *See Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1098 (10th Cir. 2001) (discrimination context).  The Plaintiffs in *Grande I* were permitted to present evidence of Defendant's aggressive efforts to stop customers from streaming live sports in violation of its exclusive rights.  *See After I*, Doc.# 468 at p. 132.  This contradicts Defendant's argument that they did not act because they could not verify the piracy in the notices. *See* Doc. #46 at p. 3.

### E.  *Defendant's internal discussions of IP copyright lawsuits are relevant.*

18.     Defendant's internal communications about other lawsuits by copyright owners against other ISPs is relevant for rebutting Defendant's innocent infringer defense.  *See* Answer [Doc. #108] at ¶¶6-7.  These internal communications will establish Defendant's knowledge that notices such as those sent on behalf of Plaintiffs could make it liable for contributory copyright infringement.  For example, Defendant's communications about the case of *BMG Rights Mgmt.*

*(US) LLC v. Cox Communs., Inc.*, 881 F.3d 293, 301 (4th Cir. 2018) will show that Defendant knew that Courts repeatedly rejected its argument that the term repeat infringer required repeat "adjudicated" infringers or that Defendant needed to be able to verify the allegations in notices before act. These communications are also relevant for establishing Defendant's willful blindness and, if Plaintiffs elect statutory damages, that the damages should be in the willful category.

19.     Defendant's internal communications about other ISP lawsuits is also relevant for rebutting Defendant's failure to mitigate damages defense. *See* Answer [Doc. #108] at ¶3. Particularly, Defendant's own comments on other ISP lawsuits will show evidence of the impracticalities of suing every direct infringer and how lawsuits such as this one against an ISP are more effective in persuading an ISP to change its policies or combatting online piracy.

**F.  *Defendant's profits and revenue from customers who pirate is relevant.***

20.     17 U.S.C. §504(b) provides that Plaintiffs are entitled to any of Defendant's profits that are attributable to the infringement. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue. Accordingly, evidence of Defendant's revenue from pirating subscribers, lifetime customer values and internal valuations are relevant for establishing infringer's profits per §504(b) and rebutting arguments Defendant appears to intend to make about practices it adopted during the COVID-19 pandemic. Should Plaintiffs elect statutory damages per§504(c), Defendant's profits and gross revenue from pirating customers is relevant for determining the appropriate range of statutory damages.

**G.  *Defendant's network monitoring practices are relevant.***

21.     In Defendant's Answer [Doc. #108] at ¶¶125-126, it denies that it monitors and/or controls its subscribers' content or can determine whether they are using BitTorrent. At ¶127, Defendant even denies that it stated in writing to its customers that "it reserves the right at any

9

time to monitor …usage…and content…" although Plaintiff included a screenshot from Defendant's policy stating just this. *See* Doc. #45 at p. 33. Evidence of Defendant's network monitoring practices will prove these allegations and rebut Defendant's denials. *See Sony Music Entm't v. Cox Communs.*, Inc., No. 1:18-cv-950-LO-JFA, 2019 WL 13298945, 2019 U.S. Dist. LEXIS 231858, at *8 (E.D. Va. Nov. 19, 2019) (finding that P2P traffic is relevant to the ISP's business mode, finance incentives and knowledge of potentially infringing activity).

### H. Defendant's management structure including its relationship within Astound is relevant.

22. Information about the individuals within Astound that control Defendant's policies and practices is relevant for evaluating whether other entities within Astound should be joined as Defendants and which individuals Plaintiffs should seek deposition testimony. Plaintiffs note that in *Grande I* Defendant argues that its financial strength to pay the $46,000,000 jury verdict should be measured by not just itself but the entire Astound group collectively. *See Grande I*, Mar. 9, 2023 Decl. of John Feehan, Doc. #502-3 at ¶3 (attached as Ex. "22"). Documents turned over by Defendant so far in discovery show that the same key people responsible for Defendant's purported DMCA policy are also responsible for other Astound group companies for which Plaintiffs have similar evidence of massive piracy of their Works. Evidence admitted in the *Grande I* trial showed there were internal communications between RCN and Grande about the *BMG. v. Cox* decision and whether they should meet with a notice provider concerning their subscribers' piracy. *See After I*, Doc. #470 at p. 95 (discussing 8/23/2016 email of Mr. Fogle of Grande to Mr. David of RCN concerning *BMG. v. Cox* decision) and pp. 113-119 (discussing 2/18/2016 email from Deborah Rankin of RCN to Mr. Rohre of Grande concerning letters from notice provider Rightscorp). Evidence that the same individuals who orchestrated Defendant's policies for creating a hotbed for piracy also did same for other entities withing the Astound group such as

RCN is relevant for showing Defendant's knowledge of the ongoing piracy, Defendant's willful blindness, that its purported DMCA repeat infringer policy is a sham and the willful nature of Defendant's contribution to infringements of Plaintiffs' Works.

*I.  Defendant's practices in response to piracy notices sent from other rightsholders is relevant for showing its DMCA policy is a sham.*

23. Whether or not Defendant has reasonably implemented a DMCA policy is determined based upon its action in response to all notices – not just those sent on behalf of Plaintiffs' Works.  Accordingly, evidence of Defendant's practices in response to notices from other rightsholders is highly relevant.

*J.  Defendant should fully answer interrogatory #12 and the deposition topics.*

24. Defendant has failed to fully disclose the available technological measures it asserts are readily available to stop or limit reproduction or distribution over peer-to-peer networks.

**V.  Conclusion**

25. For the foregoing, Plaintiffs pray that Court issue an order compelling Defendant to fully respond to the outstanding discovery without objections in 5 days, to answer the deposition topics and grant them such other and further relief to which they may be justly entitled to receive.

DATED: Kailua-Kona, Hawaii, June 21, 2023

*/s/ Kerry S. Culpepper*
Kerry S. Culpepper
CULPEPPER IP, LLLC
75-170 Hualalai Road, Suite B204
Kailua-Kona, Hawaii 96740
Telephone: (808) 464-4047
Facsimile: (202) 204-5181
E-Mail: kculpepper@culpepperip.com
Attorney for Plaintiffs

## CERTIFICATE OF CONFERENCE

Pursuant to Fed. R. Civ. P. 37(a) and RULE CV-7(g), the undersigned met and conferred with opposing counsel concerning the substance of this motion on May 31, 2023 in good faith to resolve this matter by agreement.

By: /s/ Kerry S. Culpepper

## CERTIFICATE OF SERVICE

I hereby certify that on June 21, 2023, I caused a copy of the foregoing to be served upon all counsel of record via ECF notification.

By: /s/ Kerry S. Culpepper